## Case No. 4,473.

### The EMPIRE STATE.

[2 Ben. 178.][1]

District Court, E. D. New York. Feb., 1869.

## Case No. 4,474.

### The EMPIRE STATE.

[2 Biss. 216;[1] 1 Chi. Leg. News, 393.]

District Court, N. D. Illinois. Jan., 1870.

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

D. Goodwin and A. L. Rockwell, for libellants.

McAllister & Stiles and Geo. B. Hibbard, for respondents.

DRUMMOND, District Judge. This case has been very full and ably argued by the counsel of the respective parties, and abstracts of the pleadings and evidence furnished, so as to assist the court greatly in its examination.

The facts in the case are that the schooner was coming up the lake, heading nearly south. It was a clear, star-light night, with a light wind about west south-west. The propeller was proceeding down the lake, heading about north north-west. Each saw the other when they were a considerable distance apart. Those on board of the schooner saw the lights of the propeller, and those on board of the propeller saw the schooner, but, as the say, did not in the first instance observe the lights, and supposed that the schooner was on the same course with themselves, namely, proceeding down the lake. On board the schooner there were only two men on deck at the time, the wheelsman and the mate, and immediately before and about the time of the collision the mate was not in the forward part of the schooner, but was somewhere near the wheelsman, so as to be able to give occasional directions to him if necessary. Therefore, there was not on the schooner what could properly be called a lookout at the time, and in this respect there was undoubtedly a fault on the part of the schooner.

As already stated, those on board of the propeller did not, as they allege, at first see the lights of the schooner, and supposed for this reason that the schooner was proceeding down the lake. The first direction given to the wheelsman was (the schooner being seen on the propeller's starboard bow) to starboard the helm; and the schooner not opening much, after steadying her for a short time, the order was given to starboard her a little more, which was done, and she was headed accordingly; and it was not until the schooner was observed to be crossing the bows of the propeller, as they allege, that the lights of the schooner were seen. The order was then given to port the helm, and, immediately after, the collision occurred, the schooner being struck on her port side,

not far from the stern, and being badly smashed up, the quarter, more or less of it, carried away, the helmsman carried away with it, and the schooner substantially disabled.

When those on board of the schooner saw the propeller, understanding it to be their duty to keep their course, they did so, until it was thought that a collision was imminent, when an order was given to luff up. The schooner did accordingly luff up to the wind, immediately preceding the collision; but inasmuch as this was done under the apparent pressure of an immediate collision, perhaps it is hardly to be adjudged as a fault against the schooner. Some of the officers and men on board of the schooner were more or less injured, or thrown into the water, and a boat was sent by the propeller to take off those on board the schooner and pick the others up, and they were taken on board the propeller. Some of the sails were taken in, but the mainsail was left standing with a view of keeping the schooner's head to the wind. The captain of the schooner requested the propeller to take the schooner in tow, which the master of the propeller declined to do, on the ground that he had not fuel enough, and that there might be a change in the weather. Shortly after the officers and crew of the schooner were taken on board of the propeller (the schooner being thus left upon the lake without any one on board), the propeller encountered the propeller Orion, bound to Chicago. The officers and crew of the schooner were placed on board of the Orion, and arrived at Chicago the next morning. A tug was procured, and they went down the lake with a view of finding the schooner. They found her ashore, the wind having increased with a pretty heavy sea, and were unable to do more than to dismantle her of what they could remove, amounting to perhaps $800 or $1,000, which they took to Chicago. The rest of the schooner was a total loss.

The first question is whether there was any fault on the part of the schooner which contributed to the collision. As I have said, there was no proper watch or lookout on the schooner at the time, but, inasmuch as the propeller was distinctly seen and known to be a propeller, and as it was the duty of the schooner to keep her course, it does not appear that the want of a lookout contributed in any degree to the collision.

But I am of the opinion that the schooner was in fault, in not having her lights properly located, in conformity with the act of congress of April 29, 1864, and in such a way as to furnish the kind of light contemplated by that act. Under that law it was the duty of the schooner to have on her starboard side a green light, so constructed as to show a uniform and unbroken light over an arc of the horizon of ten points of the compass, so fixed as to throw a light from right ahead to two points abaft the beam on the starboard side, and of such a character as to be visible on a

dark night, with a clear atmosphere, at least a distance of two miles; and on the port side a red light, so constructed as to show also a uniform and unbroken light over an arc of the horizon of ten points of the compass, and so fixed as to throw a light from right ahead to two points abaft the beam on the port side, and to be visible on a dark night, with a clear atmosphere, a distance of two miles.

Had the schooner these lights as thus required by the act of congress? It seems to me that she had not. The lights were, in point of fact, fixed on the pawl-bight, which is the center of the vessel, forward, and the lights were separated, the red from the green, by a board placed between them, and as I understand from the evidence, this was the only separation between the two lights. There was a lantern with a green light on one side, and a lantern with a red light on the other side of this board. These lights, thus placed on the pawl-bight amid-ships, and so that, in point of fact, the two lights were together, not being separated save in the manner described, the question is whether, within the meaning of this law, they were upon the sides of the vessel. It seems to me clear that they were not; and obviously one of the reasons why the law requires the lights to be placed, one on the starboard and one on the port side of the vessel is, that the lights may be separated, and thus greater facilities for observation be furnished to approaching vessels, so that if there should be any obstacle which for a moment might obscure the one, it might not necessarily obscure the other light; whereas, it is apparent that if these lights are both together, the one light could be hardly darkened without at the same time affecting the other. From the testimony it seems to me clear that these lights thus placed on board of the schooner could not fulfill the demand of the law, and in fact it is not certain that they did throw a light over an arc of ten points, and from right ahead to two points abaft the beam. If they did not, and could not, from their position, accomplish this object, then it is also clear, independent of all other considerations, that there were not such lights as are required by the act.

Admitting that the act does not prescribe the precise part on the side of the vessel where the light is to be located, still they must be substantially on the sides of the vessel and, as already stated, separated with a view of furnishing greater facility to observation. The safer course, as it would seem to me, would be for those managing sail vessels to place their lights as near the outside of the vessel as may be convenient, so as to meet the demands of the law.

For this reason I think the schooner had not a proper light at the time, located in the manner required by the act of congress, and therefore was in fault.

The next question is, did this fault contribute in any degree to the collision? It is claimed on the part of the libellants, conced-

ing the lights were not properly located, that those on the propeller saw the schooner; that before the collision they knew that their first impression was wrong; that the schooner was coming up the lake instead of going down, and therefore, that if the lights had been properly located, and they had seen them the object was accomplished by the observations which were actually made, and all the information communicated which the lights themselves would have furnished.

If this was clear, then it would be true that this fault did not necessarily contribute to the collision, and the consequences of it would not be visited upon the schooner. But, in view of the evidence, it is impossible for me to say that the absence of proper lights did not contribute, in some degree, to this collision. In other words, I cannot say that the absence of the lights had nothing whatever to do with the result. If we take the testimony of those on board of the propeller as true, they did not, for a considerable time see any lights on the schooner, and their action was influenced by this circumstance, and the course of the propeller was affected. Therefore, it cannot be said that there would have been the same action, and that the propeller would have taken the same course, if they had seen the lights, and the court cannot say but if the lights had been properly placed they would have seen them before they actually did, and thus that there would have been a difference in the course of the propeller.

Again, I should have been much better satisfied, if the officers and crew of the schooner had not abandoned her altogether, as they did. She was loaded with lumber. There was no danger of her sinking. There was no immediate indication of rough weather, and I think some of the officers or crew might have remained in safety on board of the schooner, to give some direction to her course. But in view of the great damage done to the schooner by the collision carrying away part of her quarter, the time of night, the fact that so many were asleep and the natural feeling of alarm that would arise from the circumstance, I do not feel inclined to visit upon this desertion the consequences of a serious fault, but rather am disposed to palliate the act. Then there was fault on the part of the schooner. Was there fault on the part of the propeller which contributed in any degree to the collision? I think there was.

According to their own showing they had reason to believe that the schooner was going down the lake ahead of them. The wind was light. Not being able to distinguish by the sails the precise course of the schooner, the propeller going at the rate of nine knots an hour, would naturally, upon the hypothesis assumed by them, very soon approach the schooner. It was the duty, therefore, of those on board of the propeller to exercise the greatest possible care and vigilance, and,

if necessary, to check the motion of the propeller. Nothing of this kind was done. The propeller kept on her course with unabated speed, and the result was that when the actual fact was ascertained that the schooner was meeting the propeller instead of proceeding on the same course with her, there was not, it would seem, the opportunity or time, under the aspect of the case, as presented to those on board of the propeller, to avoid the collision, whereas if the propeller had been under proper command the collision might have been avoided, and I think it is apparent from the whole of the testimony, that there was not that degree of vigilance and care on the part of the propeller that there ought to have been under the circumstances.

The rule is, that every possible precaution and care should be taken, and the utmost skill used to avoid a sail vessel by a propeller. It seems by the evidence, that the mate of the propeller, whose watch it was on deck at the time, not being able to make out by the naked eye alone the course of the schooner, used a glass without success. Now, being ignorant, as it is conceded they were, on board of the propeller of the course of the schooner, they should not only have guarded their own vessel and had her under complete command, but should have watched with constant vigilance the schooner. If that had been done, I am satisfied that they could have ascertained in sufficient time, the course of the schooner, and thus have avoided the collision. I think, therefore, there was this fault on the part of the propeller, which contributed to the loss.

Again, I am not satisfied with the conduct of the propeller after the collision took place. Here was a schooner run down in the lake in the night, seriously damaged, some of the crew coming very near being drowned, not far off from shore, not far from Chicago. The propeller was bound down the lake, intending to stop at Milwaukee. It seems to me that the least that the propeller could have done under the circumstances was to try and save the property which had been injured—to tow the schooner into some safe harbor where the damages could be repaired. It was rather harsh treatment thus to abandon this disabled craft upon the lake, leave her to her fate, and, I think, not justified by the facts. If the propeller had taken the schooner in tow and carried her to a safe haven, although it might have delayed the propeller, still the detention would have been inconsiderable, and it is clear much loss would have been avoided to the owners of the schooner. So that looking at the case on the whole, I think that both parties were in fault, and that the loss must be divided.

The only remaining question is as to the amount of damage. Some of the witnesses state that the schooner was worth $6,000. One of the owners states that he was offered $5,000 and refused it; what the terms were, whether it was cash, or whether on time he does not state. One of the witnesses states that the schooner is only worth $5,500. Another witness says that the schooner was worth $5,000 to $6,000. The schooner was a very old vessel; was built as long ago as 1847; she had been repaired from time to time, and was stated to be in very good condition, but it is manifest that in estimating her value, we must be influenced greatly by the fact of her being so old a vessel, and I have thought, on the whole, that $5,000 cash, taking the whole evidence and looking at all the circumstances which bear upon the question of value, would be a fair estimate to place upon her. Her owner says there was saved from the wreck from $800 to $1,000, and that in this salvage there was expended between $200 and $300. So that I have called the net value of the property saved $650. That would make the loss occasioned by the collision $4,350, which divided would cause to pass against the claimants a decree for $2,175, which will accordingly be rendered. Each party to pay their own costs.